## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

---

OLD NATIONAL BANCORP,
One Main Street
Evansville, Indiana 47708

               Plaintiff,

v.                                     Case No.    25-CV-11185

JOSEPH SEMINETTA,
602 Tyner Way,
Incline Village, Nevada 89451

and

DENISE SEMINETTA,
602 Tyner Way,
Incline Village, Nevada 89451

               Defendants.

---

## COMPLAINT

---

      Plaintiff Old National Bancorp, successor by merger to First Midwest Bancorp, Inc. ("ONB" or "the Bank"), by and through its attorneys, Kravit, Hovel & Krawczyk s.c., asserts the following for its Complaint against Defendants Joseph Seminetta ("Joe") and Denise Seminetta ("Denise") (together, "the Seminettas"):

### INTRODUCTION

      1.    This case is an example of what happens when someone tries to do by unlawful means what they could not accomplish through legitimate ones. After being rebuffed in their efforts to buy back a business they had sold for more

than $20 million just a few years earlier, the Seminettas abruptly quit their jobs and set out to recapture the value of their former enterprise for nothing, flagrantly violating their post-sale obligations to the buyer. ONB files this action to preserve the remaining value of its original bargain and to seek redress for what it has lost as a result of the Seminettas' misconduct.

2.　　In 2001, Joe and Denise Seminetta formed an independent wealth management and registered investment advisory firm called Premier Asset Management, LLC.

3.　　For 16 years, the Seminettas—as owners and full-time employees—successfully grew Premier to the point where it had hundreds of clients with approximately $560 million in assets under management.

4.　　At that time, the Seminettas decided to sell Premier to First Midwest Bancorp, Inc., the predecessor-in-interest to ONB. They received more than $22.5 million in compensation as part of the sale and, in exchange, signed employment agreements to work for the Bank and agreed to be bound by a number of restrictive covenants.

5.　　The deal was simple. FMBI/ONB purchased Premier and its book of business. In return, the Bank paid the Seminettas a tremendous amount of money and reasonably expected, based on the language of the agreements executed by the parties, that the Seminettas would work for, and with, the Bank in good faith to retain those clients. These commitments were memorialized in contracts containing covenants not to compete, solicit or otherwise interfere in any way with

2

those clients remaining with the Bank during—and after—the Seminettas' period of employment.

6.      After the sale of Premier to the Bank was completed, the Seminettas grew frustrated working under the umbrella of FMBI/ONB. In response, Joe and Denise tried to negotiate with the Bank to buy the business back. On multipole occasions, they offered millions of dollars to repurchase the business from ONB, but the Bank declined.

7.      When their repurchase plan failed, the Seminettas decided to take matters into their own hands—setting up a competing business through a co-worker who did not have similar non-compete restrictions, resigning their employment with FMBI/ONB, and then working behind the scenes to siphon their former clients over to a new entity as they waited out the remaining time left on their restrictions.

8.      After the restrictive periods expired, Joe and Denise unsurprisingly joined the new firm that their former Premier colleagues had started while the Seminettas were prohibited from participating. Not only do they work there, but based on records obtained pre-suit, the Seminettas now control and own a majority of that new firm, which primarily services the very same clients from the business that Joe and Denise sold to the Bank in 2017 for $22.5 million.

9.      There was nothing particularly sophisticated about this scheme. The Seminettas simply decided they wanted to get their business/clients back, and when the Bank would not sell it to them at the price they wanted, they took it upon

themselves to unlawfully circumvent their contractual obligations and reclaim the business without paying a dollar.

10.     In the process, the Seminettas violated several of the core commitments they made to the Bank at the time of the original sale and are now liable for the substantial damages that ONB has suffered as a result.

**PARTIES**

11.     Plaintiff Old National Bancorp is an Indiana Banking corporation with its principal place of business located at One Main Street in Evansville, Indiana. On February 15, 2022, First Midwest Bancorp., Inc. ("FMBI") merged into ONB, and ONB became the successor in interest to FMBI through an all-stock merger.

12.     Upon information and belief, Defendant Joseph Seminetta is an adult resident of Nevada, primarily residing at 602 Tyner Way, Incline Village, Nevada 89451. Upon further information and belief, Joe owns another residence in Michigan, located at 1501 W. Water Street, Suite 45, New Buffalo, Michigan 49117. Joe is married to Defendant Denise Seminetta.

13.     Upon information and belief, Defendant Denise Seminetta is an adult resident of Nevada, primarily residing at 602 Tyner Way, Incline Village, Nevada 89451. Upon further information and belief, Denise owns another residence in Michigan, located at 1501 W. Water Street, Suite 45, New Buffalo, Michigan 49117. Denise is married to Defendant Joe Seminetta.

4

**VENUE AND JURISDICTION**

14.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). Plaintiff is a citizen of Indiana. Defendants are citizens of Nevada and/or Michigan. The amount in controversy exceeds $75,000.

15.     Venue is proper in the Northern District of Illinois under 28 U.S.C § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims stated herein occurred within this district. The parties also mutually agreed, per the relevant contracts they executed with each other, that the exclusive venue for any legal disputes between them arising out of or relating to their contracts shall be the federal or state courts covering Cook County, Illinois.

**FACTUAL ALLEGATIONS**

**I.     SALE OF PREMIER ASSET MANAGEMENT.**

16.     Premier Asset Management, LLC ("Premier") was an independent wealth management and registered investment advisory ("RIA") firm, which was founded in 2001 by the Seminettas. For approximately 16 years, the Seminettas—who were both owners and full-time employees of the firm—grew Premier into a successful RIA firm.

17.     By 2016, Premier had approximately $560 million in assets under management ("AUM") for hundreds of clients.

18.     In late 2016, the Seminettas decided to cash in on their success at Premier and sell the firm to FMBI, the predecessor-in-interest to ONB.

19.     The sale was effectuated on February 28, 2017 and memorialized in a Membership Interest Purchase Agreement ("MIPA"). As part of

the sale, and pursuant to the MIPA, Joe and Denise each also executed an Employment Agreement and a Confidentiality and Restrictive Covenants Agreement ("CRCA"). A copy of the MIPA is attached to this Complaint as Exhibit A. Copies of each of the Seminettas' CRCAs are attached to this Complaint as Exhibits B and C.

20.     The Seminettas were compensated handsomely for their sale of Premier. They received more than $22.5 million total, comprised of the following: (i) a lump sum cash payment of $13.5 million paid on February 28, 2017; (ii) back-end payments in each year from 2018-2021, totaling more than $8.5 million; and (iii) shares of FMBI common stock valued at $500,000.

21.     In addition to the $22 million-plus paid to the Seminettas for their sale of Premier, Joe and Denise also received 5-year employment contracts with FMBI, providing them with base salaries of $250,000 each, plus bonuses, commissions, and equity awards. By the time the Seminettas resigned in October 2021, they had been paid nearly $3 million in additional compensation over and above the $22.5 million they received from the sale.

## II.     THE SEMINETTAS' CONTRACTUAL OBLIGATIONS.

22.     As part of the consideration for the substantial value they received from the Premier sale, the Seminettas agreed under Section 6.7(a) of the MIPA that, for a period of six years (February 28, 2017 to February 28, 2023), they would not "directly or indirectly, engage in, compete for or solicit Investment Advisory Business anywhere in the United States" and that they would not "own (directly or indirectly), operate, advise, participate in, undertake any employment

6

with, have any interest in, or be an officer, director, consultant or trustee of, any business engaged in the Investment Advisory Business."

23.     Additionally, under Section 6.7(b) of the MIPA, the Seminettas agreed that during the 6-year restricted period, they would not "directly or indirectly" do any of the following: (i) compete for or solicit or directly assist anyone else to compete for or solicit business from anyone who had been a customer or client of Premier at any point within the three-year period prior to the closing date; (ii) use for their personal benefit, or disclose, communicate or divulge to, or use for the direct or indirect benefit of anyone other than Premier or FMBI, any confidential information regarding Premier's customers or clients, or the business methods, business policies, procedures, techniques, research or development projects or results, trade secrets, or other knowledge or processes of or developed by Premier, or any other information relating to or dealing with Premier's business operations or activities, made known to them or learned or acquired by them while they were employees or members of Premier; or (iii) solicit or offer employment or directly cause or assist any other persons to solicit or offer employment to anyone who is an officer or employee of Premier as of the closing date, and continues as such at the time of such solicitation or offer, or take any action to directly cause or assist any other person to take any action intended to have the effect of causing any such employee to terminate his or her employment with Premier or FMBI.

24.     Section 6.7 of the MIPA states in full as follows:

> *Section 6.7.      Noncompetition, Nonsolicitation and Nondisparagement.*
> (a) **For a period of six (6) years after the Closing (the "Restricted Period"), each Individual Seller shall not, directly or indirectly,**

*engage in, compete for or solicit Investment Advisory Business anywhere in the United States, or own (directly or indirectly), operate, advise, participate in, undertake any employment with, have any interest in, or be an officer, director, consultant or trustee of, any business engaged in the Investment Advisory Business*; provided, however, that an Individual Seller shall not violate the foregoing restrictions by reason of ownership of less than five percent (5%) of the outstanding equity of any publicly-traded Person; *provided, further,* that an Individual Seller shall not violate the foregoing restrictions by engaging in the Investment Advisory Business as an employee of Buyer or one of its Affiliates, including the Company; *provided, further,* that an Individual Seller shall not violate the foregoing restrictions by (i) providing investment advice on a non-compensated basis to the entities listed on Exhibit 1 of such Individual Seller's Employment Agreement or (ii) writing trade, business, investment and hobby related articles for, or undertaking speaking engagements on behalf of, such entities. For purposes of this Agreement, *"Investment Advisory Business"* shall mean the investment advisory or investment management business, including providing sub-advisory, research, consulting, portfolio analysis and rebalancing, fund manager research and recommendation, asset allocation analysis, investment strategy, performance reporting and other similar services relating to the value of securities or the advisability of investing in, purchasing or selling securities or other investments, conducted by, or consistent with the business or other activities engaged in by, or investment advice provided by, the Company prior to the Closing Date.

**(b)      During the Restricted Period, each Individual Seller shall not, directly or indirectly:**

**(i)      compete for or solicit or directly assist any other Person to compete for or solicit Investment Advisory Business from any Person who has been a customer or client of the Company at any point within the three (3) year period prior to the Closing Date for purposes of diverting such Person's business from the Company, Buyer or one of their Affiliates;**

**(ii)      use for Individual Seller's personal benefit, or disclose, communicate or divulge to, or use for the direct or indirect benefit of, any Person other than the Company, Buyer or one of its Affiliates, any confidential information regarding the customers or clients of the Company, the business methods, business policies, procedures, techniques, research or development projects or results, trade secrets, or other knowledge or processes of or developed by the Company, or any other information relating to or dealing with the business operations or activities of the Company, made known to such Individual Seller or learned or acquired by such Individual Seller while an employee or member of the Company; and**

**(iii)      solicit or offer employment or directly cause or assist any other Person to solicit or offer employment to any Person who is an officer or employee of the Company as of the Closing Date, and continues as such at the time of such solicitation or offer, or take any action to directly cause or assist any other Person to take any action intended to have the effect of causing any such employee to**

***terminate his or her employment with the Company, Buyer or one of its Affiliates.***

(c)     After the Closing Date, no Seller, on the one hand, nor Buyer, on the other hand, will disparage any other party or any of such other party's shareholders, members, managers, directors, officers or employees in their capacities as such.

(d)     Sellers agree and acknowledge that: (i) the restraints provided in this Section 6.7 are fair and reasonable and not unduly burdensome on any Seller in light of the consideration provided to Sellers under this Agreement; (ii) Buyer would not have entered into this Agreement but for the agreements and covenants contained in this Section 6.7; (iii) the agreements and covenants contained in this Section 6.7 are essential to protect the business and goodwill of the Company and its business; (iv) Buyer (and the Company) would be irreparably injured in the event of a breach by any Seller of any of the obligations under this Section 6.7; (v) monetary damages would not be an adequate remedy for such breach; (vi) Buyer (and the Company) shall be entitled (without the need to post any bond) to injunctive relief, in addition to any other remedy that they may be available at Law or equity, in the event of any such breach; and (vii) the existence of any claims that a Seller may have against Buyer (or the Company), whether under this Agreement, any Ancillary Transaction Document or otherwise, shall not be a defense to (or reason for the delay of) the enforcement by Buyer (and the Company) of any of their rights or remedies under this Agreement.

(e)     If a final judgment of a court or tribunal of competent jurisdiction determines that any term or provision contained in Section 6.7(a) through (c) is invalid or unenforceable, then the parties agree that the court or tribunal will have the power to reduce the scope, duration or geographic area of the term or provision, to delete specific words or phrases or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision. This Section 6.7 will be enforceable as so modified after the expiration of the time within which the judgment may be appealed.  This Section 6.7 is reasonable and necessary to protect and preserve Buyer's legitimate business interests and the value of the Company and to prevent any unfair advantage conferred on Sellers. (Emphasis added.)

25.    The Seminettas also each signed CRCAs containing additional restrictive covenants. At Section 6 of the CRCAs, the Seminettas agreed that they would not compete with, or assist others to compete against, FMBI/ONB for a period of two years following the termination of their employment for any reason. Specifically, the Seminettas agreed in Section 6 of the CRCAs that for 24 months following the termination of their employment, they would not "accept any position

with any financial institution . . . which involves, directly or indirectly, investment advisory or investment management business, including providing sub-advisory . . . investment strategy, performance reporting and other similar services relating to the value of securities or the advisability of investing in, purchasing or selling securities or other investments."

26.     The CRCAs included other restrictions beyond the traditional non-compete. Section 2 of the CRCAs, for example, prohibited the Seminettas from using or disclosing FMBI/ONB's confidential information.

27.     Section 3 of the CRCAs prohibited the Seminettas from interfering in any way with FMBI/ONB's customers.

28.     Section 4 of the CRCAs prohibited the Seminettas from soliciting or hiring any of FMBI/ONB's employees.

29.     Section 5 of the CRCAs included a non-disparagement provision, pursuant to which the Seminettas agreed not to make any statement or disclosure that disparages FMBI/ONB.

30.     Through their conduct, the Seminettas violated all of the restrictive covenants they contractually agreed to in the MIPA and their CRCAs.

**III.    FORMATION OF INNOVIS.**

31.     Innovis Asset Management, LLC ("Innovis") was a competing RIA firm ostensibly founded by Chad Whiteley ("Whitely"), a former employee of Premier, in 2022.

32.     Whiteley, who resigned suddenly and without compensation from Premier on March 4, 2022, had worked as a junior "Portfolio Manager" at the

10

Bank. Unlike the Seminettas, as a non-senior employee, Whiteley did not have a contractual non-compete agreement. Accordingly, Whiteley was technically "free" upon his resignation to start his own RIA firm and compete <u>fairly</u> with Premier. However, with the Seminettas's help, that's not what he did.

33.     Innovis, in fact, was established on January 7, 2022, approximately two months before Whiteley resigned. He then registered Innovis with the SEC on March 3, 2022, one day before he resigned.

34.     Defendants will claim that, within just weeks of its formation, Whiteley somehow convinced 70 clients with approximately $287 million in AUM to transfer their accounts from ONB to the nascent Innovis, despite its founder having had no prior experience in firm management.

35.     In truth, assisted by the Seminettas, client solicitations had been active for months before Whiteley resigned and registered Innovis.

36.     Between March 21, 2022 and March 31, 2022, 107 Premier accounts were "de-linked" from Charles Schwab, meaning that Plaintiff was removed as the listed advisor for those client accounts and replaced by new advisors, all of whom were affiliated with Whiteley, the Seminettas, and their new venture. Time stamps confirm that many of these accounts were de-linked within minutes, if not seconds, of each other.

37.     Many of the accounts were de-linked through limited powers of attorney ("LPOAs") rather than by the clients themselves. Meeting with a client, persuading them to move their business to a start-up firm, and then further

convincing them to provide that new firm with an LPOA to effectuate the switch of advisors obviously takes time. Accordingly, if the mass de-linking occurred largely by LPOA starting on March 21, 2022, many of the LPOAs would have needed to be executed by clients well before that.

38.     But even with that kind of "head start," Whiteley could not have acquired $287 million in AUM in such short period of time while acting alone, and he didn't; he had help from the Seminettas and their associates.

39.     Two of the first employees of Innovis also came from Premier. Bob Costello was employed as a "Senior Portfolio Manager" until he resigned on October 13, 2021 (on the same day as the Seminettas). According to his "LinkedIn" profile, Mr. Costello served as a "Managing Director" at Innovis. Alex Saf was a junior "Portfolio Manager" at Premier until he resigned on March 16, 2022, less than two weeks after Whiteley left Premier. Thereafter, Saf immediately began working as a "Portfolio Manager" at Innovis.

40.     Growing a brand-new RIA firm from nothing to $287 million in AUM in a matter of weeks is an astounding feat. And one that did not occur legally. Whiteley and Innovis were assisted and supported by the Seminettas in violation of their contractual duties.

## IV.     THE SEMINETTAS RESIGN AND JOIN WHITELEY.

41.     Despite the multi-eight-figure compensation the Seminettas received for selling Premier to FMBI/ONB, Joe was frustrated with his employment situation working under the control of ONB's predecessor, FMBI.

12

42. In the fall of 2021, Joe strongly pushed to make a deal under which he and Denise would buy back Premier for $14 million. When such a deal did not come to fruition, the Seminettas abruptly resigned in October 2021, and hatched a plan to unlawfully reconstitute the company in a new form.

43. Unwilling to wait out the restrictive period and abide by the other contractual obligations they agreed to with ONB, the Seminettas needed a strawman or shell firm where they could redirect ONB's clients (which, contrary to their contractual obligations, the Seminettas still regarded as their own) while they were restricted, and they found one in Whiteley, whom they knew was free of the restrictions under which they were operating.

44. The Seminettas agreed to support Whiteley and assist him and Innovis in funneling clients from ONB to the new venture.

45. In September 2022, Joe, along with Whiteley, reached out to other former Premier employees—including Thomas Grooms and Jason Bulinski—soliciting them for what Joe referred to as "Premier 2.0." He invited them to his house in Lake Tahoe to discuss his and Denise's plans. It was clear client solicitations were already well underway by that time.

46. For starters, Denise herself was identified as a "financial advisor" for Innovis as of September 2022.

47. In mid-October 2022, one of Plaintiff's advisors met with a high-net-worth client in Naples, Florida. During that meeting, the advisor was told that

Joe had scheduled a meeting with the client for the following week for the purpose of soliciting their financial advisory business.

48.     In mid-December 2022, one of Plaintiff's advisors met with another client in Long Grove, Illinois. During that meeting, the client informed the advisor that "Joe Seminetta stopped by to see me." The client then confirmed they were not going to move their accounts away from Plaintiff, indicating that Joe had solicited the client's business as of December 2022.

49.     Upon information and belief, the Seminettas used various tactics to try to disguise their improper actions, including using "burner" phones and other communication applications that could be concealed.

50.     Meanwhile, Innovis filed its first annual report on February 28, 2023—the very day the MIPA restrictions expired.

51.     The Seminettas' subsequent actions only further confirm their wrongful conduct. In the fall of 2023, they formed Sierra Summit Advisors, LLC ("Sierra Summit") along with Whiteley. For all his supposed "success" with Innovis, Whiteley was willing to effectively "gift" the majority stake in the hundreds of millions of dollars in AUM Innovis had generated to the Seminettas through their interest in Sierra Summit.

52.     Upon information and belief, the Seminettas planned all along to form their own entity with Whiteley once their restrictions with Plaintiff ended. During the interim restrictive period, Whiteley would serve as the *de facto* face of Innovis, so that clients could be directed to, and engaged with, that entity, which on

14

paper had no official affiliation with the Seminettas. But the Seminettas improperly solicited clients and assisted Whiteley with the new venture, knowing eventually they would own and operate the next entity (Sierra Summit, or as Joe referred to it, "Premier 2.0") once their restrictive periods expired.

53.     The suggestion that Innovis was an RIA firm established and operated exclusively by Whiteley, without any assistance from the Seminettas, was always a farce that has now been confirmed by two irrefutable facts: (1) that it no longer exists; and (2) that its direct successor, Sierra Summit, is majority owned and controlled by the Seminettas.

54.     In summary, (i) the Seminettas made a final effort to reacquire Premier for millions of dollars on October 8, 2021; (ii) shortly thereafter, the Seminettas realized they would be unsuccessful in repurchasing their former firm and chose to resign instead, along with Bob Costello, on October 13, 2021 with plans to unlawfully circumvent their contractual restrictive covenants through a strawman/temporary shell company, Whiteley/Innovis; (iii) to that end, Whiteley formed Innovis on January 7, 2022—just 86 days after the Seminettas (and Costello) resigned; (iv) Whiteley, a low level portfolio manager with no substantial client contacts of his own, then resigned on March 4, 2022; (v) a mere 59 days later, with the support and assistance of the Seminettas, and propelled by the Seminettas' improper solicitations, Whiteley reported $287 million in AUM; and then (vi) once the restrictive period was over, Whiteley essentially gifted Innovis' clients/business back to the Seminettas and their newly formed entity, Sierra Summit, thereby

15

completing this ham-handed scheme to unlawfully reacquire (read: steal) the valuable Premier business for nothing.

## FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT FOR VIOLATION OF MIPA – AGAINST JOE AND DENISE SEMINETTA)

55. Plaintiff restates and realleges all previous allegations as if fully stated herein.

56. The MIPA constitutes a valid, enforceable agreement between Plaintiff and Defendants Joe and Denise Seminetta.

57. By acting in the manner described in this complaint, both Joe and Denise breached the MIPA, including but not limited to, section 6.7.

58. Joe and Denise are each liable for their respective breaches of the MIPA.

59. Plaintiff has been damaged by Defendants' breaches, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (BREACH OF CONTRACT FOR VIOLATION OF CRCA – AGAINST JOE SEMINETTA)

60. Plaintiff restates and realleges all previous allegations as if fully stated herein.

61. The CRCA between Plaintiff and Defendant Joe Seminetta constitutes a valid, enforceable agreement.

62. By acting in the manner described in this complaint, Joe breached the CRCA, including but not limited to, sections 2, 3, 4, 5, and 6.

63. Joe is liable for his breaches of the CRCA.

16

64. Plaintiff has been damaged by Joe's breaches, in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (BREACH OF CONTRACT FOR VIOLATION OF CRCA – AGAINST DENISE SEMINETTA)

65. Plaintiff restates and realleges all previous allegations as if fully stated herein.

66. The CRCA between Plaintiff and Defendant Denise Seminetta constitutes a valid, enforceable agreement.

67. By acting in the manner described in this complaint, Denise breached the CRCA, including but not limited to, sections 2, 3, 4, 5, and 6.

68. Denise is liable for her breaches of the CRCA.

69. Plaintiff has been damaged by Denise's breaches, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### AGAINST JOE AND DENISE SEMINETTA)

70. Plaintiff restates and realleges all previous allegations as if fully stated herein.

71. Plaintiff and Defendants entered into contractual relationships with each other—under both the MIPA and CRCAs—wherein an implied covenant of good faith and fair dealing was automatically incorporated as an implied term.

72. Defendants, through the conduct described herein, failed to exercise good faith in the performance, enforcement, or carrying out of the terms of one or more of their contracts with Plaintiff.

17

73.     Through their conduct, Defendants failed to endeavor to accomplish the objectives of their contracts with Plaintiff.

74.     Defendants breached their duty of good faith and fair dealing which is implied in the contracts in which they entered with Plaintiff.

75.     Plaintiff has been damaged by Defendants' breaches of the implied covenant of good faith and fair dealing, in an amount to be proved at trial.

**WHEREFORE**, Plaintiff demands a judgment for:

a.  Compensatory damages in an amount to be proven at trial based on Defendants' breaches of the MIPA and CRCAs;

b.  Damages for Plaintiff's out-of-pocket expenses, costs, interest, attorneys' fees, consultants' fees, and expert fees and expenses; and

c.  Such other further relief as the Court deems just and equitable.


Dated: September 16, 2025             KRAVIT, HOVEL & KRAWCZYK s.c.


                                      /s/ *Benjamin R. Prinsen*
                                      Benjamin R. Prinsen
                                      Illinois State Bar No. 1074311
                                      Christopher J. Krawczyk
                                      Wisconsin State Bar No. 1033982
                                      Aaron H. Aizenberg
                                      Wisconsin State Bar No. 1066340
                                      825 North Jefferson St., Ste. 500
                                      Milwaukee, Wisconsin 53202
                                      (414) 271-7100 (telephone)
                                      (414) 271-8135 (facsimile)
                                      cjk@kravitlaw.com
                                      aha@kravitlaw.com
                                      brp@kravitlaw.com
                                      *Attorneys for Plaintiff*